UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WALTER HARRIS | CIVIL ACTION |
| VERSUS | NO:  04-2580 |
| OMEGA PROTEIN, INC. | SECTION: "S" (5) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. BACKGROUND**

On August 24, 2004, Walter Harris was a seaman employed as the chief engineer aboard Omega Protein, Inc.'s (Omega) fishing vessel, the Q. O. DUNN.  Harris began his employment with Omega in 1990 and received on-the-job training.  During the fishing season, Harris worked 18 to 20 hours each day.  At approximately 1:30 a.m. on August 24, 2004, Harris slipped on the second step of the metal stairway that leads from the upper engine room to the lower engine room, landed on his buttocks, and "bounced" down the remaining stairs.  Harris was able to stand up and climb the stairway to his living quarters.  He noticed a bruise on his right ankle and a red mark on his back.

Harris did not report the accident immediately, but waited until morning when Captain Frederick Newton was awake.  The Captain offered to take Harris to shore, but Harris declined because he did not want to impose on the rest of the crew.  Harris experienced pain in his lower back and left hip.  For the remainder of the day, he did not conduct his regular activities, and the

mate helped him with deck duties. When Harris arrived at the dock, no one was there to take him to the doctor. He slept in his truck until 8:30 the next morning when an Omega representative came to take him to Dr. Gregory Gidman, the company-recommended doctor. Dr. Gidman examined Harris and released him to light duty for four days. He suggested that Harris return for another visit. After his examination, Harris drove himself home to Moss Point, Mississippi, and did not return to work.

Harris filed an admiralty and maritime complaint under Federal Rule of Civil Procedure 9(h) against Omega, asserting claims of negligence under the Jones Act, 46 U.S.C. § 688, and unseaworthiness and maintenance and cure under the general maritime law.

## II. DISCUSSION

### A. Negligence and unseaworthiness

Harris alleges that Omega was negligent in failing to take the following steps: remedy the defective stairway by applying a non-skid surface, replace a defective stairway that was improperly installed in front of a protruding pipe, and provide training to its crew regarding the safety of the stairways. Harris further contends that the defective stairway was a dangerous condition that rendered the vessel unseaworthy.

#### 1. Legal standard

Jones Act negligence and unseaworthiness claims are separate causes of actions and are treated as such. See Brunner v. Maritime Overseas Corp., 779 F.2d 296, 298 (5th Cir. 1986). In this case, the basis of both the negligence and unseaworthiness claims is that Harris was injured as he walked down the stairs because of the improper and unsafe stair surface.

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (en banc). The employer is held to a standard of ordinary prudence under the circumstances. Id. "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." Id. The terms "slightest" and "featherweight" have been used to describe the reduced standard of causation between the employer's negligence and the employee's injury. Id. at 335; Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5th Cir. 1988).

A seaman is obligated under the Jones Act "to act with ordinary prudence under the circumstances" to protect himself from injury. Id. at 339. "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable seaman in like circumstances." Id. An employee's contributory negligence does not bar a recovery; however, the damages maybe reduced in proportion to the negligence attributable to the employee. See 45 U.S.C. § 53.

"[L]iability based upon unseaworthiness is wholly distinct from liability based upon negligence." Usner v. Luckenbach Overseas Corp., 91 S.Ct. 514, 517 (1971). "Although the shipowner has an absolute duty to provide a seaworthy vessel, the vessel need not be 'accident free.'" Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1432-33 (5th Cir. 1988). "For a vessel to be found unseaworthy, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for

3

which it is to be used." Jackson v. OMI Corp., 245 F.3d 525, 527 (5th Cir. 2001). "[A]n unsafe method of work may also render a vessel unseaworthy." Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992). The duty to provide a seaworthy vessel is absolute and completely independent of the duty under the Jones Act to exercise reasonable care; therefore, a showing of negligence is not required. See Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992).

### 2. Evidence of the accident

Harris testified that he fell down eight stairs and was injured. There were no witnesses to the accident to corroborate Harris' testimony. Captain Freddie Newton testified that Harris reported the accident to him at approximately 7:00 a.m. Harris stated that the accident occurred because he missed the step and lost his footing. Harris descended the stairway quickly without looking down at the treads and holding only the right handrail. He stated that he could have caught himself if he had been holding two handrails. Harris described the event as a "freak accident." Harris denied that he was hurt, but agreed to go to the doctor to be checked out.

### 3. Evidence of injury

At trial, Harris presented medical evidence of his injury. Harris was examined by Dr. Gidman and was released to light duty for four days and instructed to return. Harris did not return to see Dr. Gidman, but went home to Moss Point, Mississippi where he was seen by Dr. Chris Wiggins, who recommended that Harris undergo an MRI. Harris did not follow the recommendation, and never returned to see Dr. Wiggins. Omega's claims manager, David Ott, testified that Harris had been pre-approved for the MRI, but never scheduled it.

Harris saw Dr. John Watermeier on September 27, 2004, for pain and restricted motion of his back. Dr. Watermeier recommended diagnostic tests, an MRI, and an EMG. He also recommended a bone scan and a home muscle stimulator device, and placed Harris on medication for pain. Dr. Watermeier felt that Harris should remain on temporarily disabled status and asked him to return in four weeks.

In November 2004, Dr. Gerald Burns performed an EMG. The findings indicate that there was some nerve pathology. The CT scan and a MRI performed at Diagnostic Imaging Services showed no disc herniation, neurocompression or acquired spinal stenosis. Based on the test results indicating that Harris' condition was within normal limits, Dr. Watermeier recommended physical therapy.

In December 6, 2004, Harris returned to Dr. Watermeier with continuing complaints of back and bilateral leg pain. Dr. Watermeier found that his physical condition had improved, and his range of motion was "75 to 80%" of normal. Dr. Watermeier ordered Harris to continue on temporary disability status and pain medication. On January 12, 2005, Harris' symptoms were unchanged. Dr. Watermeier prescribed additional pain medication and ordered a discogram.

On February 23, 2005, the results of the discogram showed no abnormality at L4-5, the area where Harris indicated he had pain. Dr. Watermeier ordered an epidural spinal injection to relieve the chronic back and leg pain and instructed Harris to return in three months. Harris received the epidural injection in March and returned to Dr. Watermeier on April 18, 2005, complaining of the same symptoms of back and leg pain. Because Harris had benefitted from the epidural injection, a second epidural was ordered.

On June 27, 2005, Harris returned to the clinic with the same complaints, and Dr. Watermeier determined that there was no change in his condition. Dr. Watermeier opined that it would take 12 to 18 months to recover from the effects of the trauma and predicted that some symptoms would be permanent. Dr. Watermeier did not recommend surgery because there is not a ruptured disc.

Dr. Lawrence Glorioso, a radiologist, testified concerning the results of a stand-up open MRI on November 30, 2005. Dr. Glorioso found a 2 mm posterior protrusion of the L5-S1 intervetebral disc and bulging of the L4-5 intervetebral disc. Harris exh. 30. Dr. Glorioso explained that a protrusion is an abnormal finding usually related to trauma, and not normal degeneration.

Harris last visit with Dr. Watermeier was June 27, 2005, and Dr. Kenneth Adato assumed Harris' care after Hurricane Katrina. Dr. Adato testified that he would recommend pain management for Harris because he is not a surgical candidate.

**4. Evidence of causation**

To support his allegation that the accident was caused by Omega's negligence and the unseaworthiness of the vessel, Harris presented the testimony of marine safety expert, Geoffrey Webster, who examined the engine room and engine room stairway on February 26, 2005. Webster concluded that the steps were unsafe because the non-skid surface was worn, especially on the nosing, and the raised portions of the diamond plating no longer provided traction because they were filled with paint. Further, Webster opined that Harris fell when the heel of his boot hit a pipe which protrudes at the back of the second step, causing Harris to stumble.

Harris testified that, at the time of the accident, he checked to see if there was oil on the stairs, but he did not look for slickness or wear and tear. It was not until he returned to the vessel to retrieve his belongings that he noticed that the treads on the stairs appeared to be worn.

John Matthews, the manager of eleven of Omega's vessels, testified that he had changed out the tread plates on the stairs of other vessels, but that his inspection of the stairs on the Q.O. DUNN indicated there was not a problem. Matthews stated that, if he had received a report that the stairs were in an unsafe condition, he would have replaced them. He referred to the Vessel Safety Inspection Checklists completed by Harris on August 6, 2004, and by Captain Newton on September 3, 2004, which indicate that the decks and ladders of the engine room were inspected before the 2004 season and were found "free of slip & trip hazards." Omega exhs. 4 and 5.

**5. Conclusion**

Based on Harris' credible testimony and the supporting medical records, the court finds that there was an accident with injury when Harris fell down the stairs. The court finds, however, that the accident was caused by Harris' missing the step and losing his footing. Omega was not negligent and did not cause Harris' accident and injury. In reporting the accident, Harris did not mention the condition of the stairway as the cause of the accident. Although Harris testified that the noses and diamond tread plates appeared to be worn, Matthews inspected the stairs during the off-season, and he received no reports from Harris that the stairs were worn or dangerous.

The court does not find credible Webster's theory that a pipe at the back of the second step caused Harris to fall. Harris did not attribute his fall to the pipe in his report to the Captain

or in his deposition. The court is not convinced that the back of the boot hit the pipe and affected Harris' ability to descend the stairway.

The court further finds that Harris has not shown that Omega provided a stairway or a working condition that was not reasonably fit and safe. The stairway was inspected regularly, and there is no indication that the stairway was ever viewed by anyone as a dangerous condition that rendered the vessel unseaworthy.

**B. Maintenance and cure**

Harris contends that Omega arbitrarily and capriciously denied adequate maintenance and cure benefits. He further contends that he will require future pain management treatment as a result of the accident.

"Maintenance and cure is an ancient duty imposed upon a shipowner to provide for a seaman who becomes ill or injured during is service to the ship." Silmon v. Can Do. II, Inc., 89 F.3d 240, 242 (5th Cir. 1996). The duty is implied in maritime employment contracts and is not premised on the fault or negligence of the shipowner. Id. "The right terminates only when maximum cure has been obtained." Bertram v. Freeport McMoran, Inc., 35 F.3d 1008, 1012 (5th Cir. 1994) (internal quotation and citation omitted). "Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition." Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 95 (5th Cir. 1985). It is proper to declare maximum cure if the condition is incurable or if further treatment will only relieve pain and suffering. See Pelotto v. L & N Towing Co., 604 F.2d 396, 404 (5th Cir. 1979).

The court finds that Harris has attained maximum medical improvement. Dr. Adato last

saw Harris on March 2, 2006, but did not have the benefit of Harris' medical records from Dr. Watermeier. Dr. Adato testified that, if the information had been available, he would have told Harris that he had reached maximum medical improvement by March 2, 2006. Any further treatment for Harris will address only pain management. Accordingly, Harris is entitled to be paid maintenance at the standard industry rate and cure for all of the medical treatment he received from August 24, 2004, to March 2, 2006, when he attained maximum medical improvement. See Plaintiff's summaries, exhs. 43 and 44. Omega will receive credit for any amount that has already been paid to Harris or his healthcare providers.

The evidence does not support a finding that Omega unreasonably rejected Harris' claim for maintenance and cure. David Ott, Omega's claims manager, testified that maintenance and cure was instituted when Harris was injured and discontinued only when Harris sought no further treatment and ceased supplying reports to Omega. See Omega's exh. 7. The reports of Dr. Watermeier indicate that Harris was being treated for pain management only. Harris has not shown that Omega's handling of his claim was unreasonable under the circumstances.

### III. CONCLUSION

The court finds that Harris was injured when he missed a step, lost his footing, and fell down a flight of metal stairs. Omega, however, was not negligent and did not cause Harris' accident and injury. The vessel was not unseaworthy As a seaman, Harris is entitled to maintenance and cure, regardless of the lack of fault or negligence of Omega, from the time of his injury on August 24, 2004, until he attained maximum medical improvement on March 2, 2006. Omega shall receive a credit for any amount that has already been paid to Harris. The

court also finds that Omega did not unreasonably withhold payment of maintenance and cure from Harris.

New Orleans, Louisiana, this  20th  day of July, 2006.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**